

|  |  |
|---|---|
|  | **U.S. Department of Justice** |
|  |  |
|  | *United States Attorney* |
|  | *Eastern District of New York* |
| CRH:JAM/EHS | *271 Cadman Plaza East* |
| F. #2022R00963 | *Brooklyn, New York 11201* |

July 8, 2024

<u>By ECF</u>

The Honorable LaShann DeArcy Hall
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   <u>United States v. Kristina Puzyreva</u>
           <u>Criminal Docket No. 23-452 (LDH)</u>

Dear Judge DeArcy Hall:

      The government respectfully submits this letter in advance of the defendant Kristina Puzyreva's sentencing, which is scheduled for July 24, 2024. On February 12, 2024, the defendant pleaded guilty to one count of money laundering conspiracy in violation of Title 18, United States Code, Section 1956(h). The defendant's advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines") is 24 to 30 months' imprisonment. The defendant stipulated to a Guidelines calculation of 18 to 24 months' imprisonment in a written plea agreement with the government. The discrepancy between these calculations is based on a calculation of the laundered funds. The government's plea agreement accounts for funds personally attributable to Puzyreva, while Probation's calculation correctly includes the amount of laundered funds for the conspiracy. The government does not object to Probation's calculation of the Guidelines. Although the government is not bound by its calculation in the plea agreement, the government respectfully recommends a sentence of 24 months' imprisonment, which is within the accurate Guidelines calculation, as well as the stipulated Guidelines calculation.

I. <u>Background</u>[1]

A. <u>The Export Control Reform Act and Export Administration Regulations</u>

On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which included the Export Control Reform Act ("ECRA"). <u>See</u> 50 U.S.C. § 4801 <u>et seq</u>. ECRA provided permanent statutory authority for the Export Administration Regulations ("EAR"), Title 15, Code of Federal Regulations, Parts 730-774.

ECRA provides that "the national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items, and specified activities of United States persons, wherever located, be controlled." 50 U.S.C. § 4811. To that end, ECRA granted the President the authority to "(1) control the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or foreign persons; and (2) the activities of United States persons, wherever located, relating to" specific categories of items and information. 50 U.S.C. § 4812. ECRA granted to the Secretary of Commerce the authority to establish the applicable regulatory framework. 50 U.S.C. § 4813.

Through the EAR and ECRA, the U.S. Department of Commerce's Bureau of Industry and Security ("BIS") reviews and controls the export from the United States to foreign destinations of certain items. In particular, BIS places restrictions on the export and reexport of items that it determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States. Such restrictions depend on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use of the item.

The most sensitive items are identified on the Commerce Control List ("CCL") set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1. Items listed on the CCL are categorized by Export Control Classification Number ("ECCN"), each of which is subject to export control requirements depending on destination, end use, and end user of the item.

Since February 24, 2022, when Russia launched its invasion of Ukraine, BIS has implemented a series of stringent export controls that restrict Russia's access to technologies other items that it needs to sustain its attack on Ukraine. As of April 8, 2022, license requirements for exports, reexports, and transfers to or within Russia were expanded to cover all items on the CCL. <u>See</u> 87 Fed. Reg. 12226 (Mar. 3, 2022); 87 Fed. Reg. 22130 (Apr. 14, 2022); 15 C.F.R. § 746.8. On March 3, 2022, BIS imposed additional license requirements for exports, reexports, and transfers to or within Russia of any items subject to the EAR that were identified under certain Schedule B or Harmonized Tariff Schedule 6 ("HTS") numbers. <u>See</u> 87 Fed. Reg. 12856 (March 8, 2022); 15 C.F.R. Part 746, Supp. No. 4. HTS codes took their first six digits from the corresponding Harmonized System ("HS") code, which is a standardized numerical method of classifying traded products that is used by customs authorities around the world. On September 14, 2023, working in conjunction with the United Kingdom and European Union, BIS published

---

[1] Unless otherwise noted, the following facts are taken from the PSR dated March 27, 2024, and the factual record in this case.

2

a "Common High Priority Items List," which identified items by their corresponding HTS codes that Russia sought to procure for its weapons programs. See https://www.bis.doc.gov/index.php/all-articles/13-policy-guidance/country-guidance/2172-russia-export-controls-list-of-common-high-priority-items. According to BIS, these priority items pose a heightened risk of being diverted illegally to Russia because of their importance to Russia's war efforts.

Through the EAR, BIS also publishes the Entity List, which identifies certain foreign persons—including businesses, research institutions, government and private organizations, individuals, and other types of legal persons—that are subject to specific export license requirements and policies, in addition to those found elsewhere in the EAR, due to a determination that such persons had engaged in activities contrary to U.S. national security and/or foreign policy interests. See 15 C.F.R. § 744.11; 15 C.F.R. Part 744, Supp. No. 4 (the Entity List).

Under ECRA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any regulation, order, license, or authorization issued pursuant to the statute, including the EAR. See 50 U.S.C. § 4819(a)(1).

Additionally, an exporter of goods from the United States is required to file information with the U.S. government about the intended exports under certain circumstances. Specifically, an exporter is required to file Electronic Export Information ("EEI") through the Automated Export System ("AES") when, among other reasons, an export license was required, or the value of the commodity being exported was more than $2,500. 15 C.F.R. § 758.1. The EEI requires an exporter to list, among other things, the destination country, the ultimate consignee's name and address, the intermediate consignee's name and address, and a description of the commodity to be exported. Failure to file EEI or providing false or misleading information in EEI is a violation of ECRA (see, e.g., 50 U.S.C. 4819(a)(2)(F)), the EAR (see 15 C.F.R. Part 758), 13 U.S.C. § 305, and the Foreign Trade Regulations (see 15 C.F.R. Par 30).

  B. Overview of the Criminal Scheme

The defendant, her husband and co-defendant Nikolay Goltsev, co-defendant Salimdzhon Nasriddinov, and others, participated in a scheme to smuggle U.S.-origin "dual-use" electronics to Russia. Using corporate entities known as "SH Brothers" and "SN Electronics," the defendants sourced, purchased, and exported to Russia millions of dollars of dual-use electronics from U.S. manufacturers and distributors located in the Eastern District of New York and elsewhere. Many of these items required a license from BIS to be exported to Russia. Even for items that did not require such a license, defendants Goltsev and Nasriddinov made and caused to be made false and misleading statements in EEI to conceal the fact that Russia was the ultimate end destination and that certain entities and individuals in Russia were the ultimate end users. As such, the defendants and their co-conspirators caused U.S. companies to sell and export electronic components in violation of ECRA and other U.S. laws and regulations; process and accept payments in furtherance of such illicit transactions; and file false documents and fail to file documents with BIS and other U.S. government agencies, including required statements regarding the ultimate consignee and purchaser.

3

Russian companies that sought to acquire particular parts or items from the United States placed orders with Goltsev. Goltsev communicated directly with U.S. manufacturers and distributors, typically using aliases. In those communications, Goltsev misrepresented and omitted material information, including information about how the items would be used, the various parties involved in the transactions, and the identities of the ultimate Russian end users.

Goltsev and Nasriddinov then purchased the items, including electronic components and integrated circuits, from U.S. companies. Nasriddinov received the items at various addresses he controlled in Brooklyn, New York, where he supervised their repackaging and export. Goltsev and Nasriddinov exported these items from the United States and transshipped them to Russia and Russian end users through a variety of intermediary companies in Turkey, Hong Kong, China, India, the UAE, and elsewhere. Some of these intermediary companies received U.S. exports solely from SH Brothers, including Robotronix Semiconductors LTD ("Robotronix"), which was listed as an intermediate consignee on approximately 32 shipments valued at more than $600,000, ostensibly for end users in China. BIS added Robotronix to its Entity List on October 6, 2023. See 88 Fed. Reg. 70352 (Oct. 11, 2023).

Some of the electronic components and integrated circuits sourced, purchased, and exported by the defendants were designated as "Tier 1" items on the Common High Priority Items List, which, according to BIS, were of the highest concern due to their critical role in the production of advanced Russian precision-guided weapons systems, Russia's lack of domestic production, and limited global manufacturers. Indeed, some of the same makes, models, and part numbers of electronic components exported by the defendants through SH Brothers were found in seized Russian weapons platforms and signals intelligence equipment in Ukraine, including the Torn-MDM radio reconnaissance complex, the RB-301B "Borisoglebsk-2" electronic warfare complex, the Vitebsk L370 airborne counter missile system, Ka-52 helicopters, the Izdeliye 305E light multi-purpose guided missile, Orlan-10 unmanned aerial vehicles ("UAVs") and T-72B3 battle tanks.

In or about and between August 2022 and September 2023, U.S. Customs and other records show that SH Brothers exported more than 250 shipments of electronic components, valued at more than $7 million, to third-country transshipment companies; the shipments were then unlawfully diverted to Russia. During this same period, financial records, including wire transactions through correspondent accounts at New York City banks and within the Eastern District of New York, reflected millions of dollars in payments from Russian entities to these transshipment companies.

Goltsev and Nasriddinov were aware that the electronics being shipped had potential military applications. In a February 23, 2023, message, Nasriddinov wrote to Goltsev, "Happy Defender of the Fatherland," referring to the holiday in Russia and parts of the former Soviet Union celebrating those who served in the armed forces. Nasriddinov attached to the message a screenshot showing activity in an SH Brothers bank account. Goltsev responded, "happy holiday to you too my friend, we are defending it in the way that we can [smile emoji]."

C. <u>Puzyreva Was a Linchpin in the Criminal Conspiracy</u>

Puzyreva's role in the conspiracy was critical—she controlled bank accounts and deposited cash which allowed the co-conspirators to get access to the extensive profits they earned from their scheme. Puzyreva caused U.S. financial institutions to process payments in violation of U.S. laws and regulations. Many of these transactions were processed through bank accounts held by SH Brothers and SN Electronics and correspondent accounts at New York City banks in New York City and within the Eastern District of New York. The scheme would not have been as effective without Puzyreva's role in laundering the illicit proceeds of the money.

For example, Puzyreva was the signatory on two New York-based bank accounts, one that listed Nasriddinov's home address in Brooklyn, New York as the address of record. Statements for these accounts reflected large cash deposits made in Brooklyn that corresponded with trips that Puzyreva and Goltsev made from Canada to meet with Nasriddinov. Some of these deposits were in amounts just under $10,000. Notably the Internal Revenue Service ("IRS") maintains a transaction reporting requirement providing that any person who, during trade or business, receives more than $10,000 cash in a single transaction is required report the transaction to the IRS. For example, on or about December 27, 2022, a $9,800 cash deposit was made into one of Puzyreva's accounts at an automated teller machine ("ATM") in Manhattan, New York. On or about May 23, 2022, a cash deposit of $8,700 was made into one of Puzyreva's accounts at an ATM in Manhattan, while a $4,000 deposit was made on the same day into the same account from an ATM in Brooklyn located near an address used by Nasriddinov and SH Brothers. On or about March 13, 2023, a cash deposit of $9,700 was made into one of Puzyreva's accounts at an ATM in Manhattan. These deposits were then transferred to accounts held and used by Puzyreva and Goltsev in Canada.

The co-conspirators explicitly discussed how they would structure deposits to avoid detection. On or about October 5, 2023, Puzyreva wrote to Goltsev, "did you deposit the American money?"[2] Goltsev wrote back, "No babe I put actually less, more than 10,000 Canadian is not good to deposit because they write some sort of report automatically, so in order to avoid this I put 7,100. The rest we will add in a couple of weeks. The rest of what we have in our house from the last trip across the border. We will need to deposit that also. Little bit by bit, but with certainty."

The criminal conspiracy was extremely profitable for the defendants, including Puzyreva. In a text message exchange on or about January 13, 2023, Goltsev complained to Puzyreva that a subordinate of a co-conspirator "asked me to make 80 accounts . . . I am making accounts for 3 mln [i.e., million]. Fingers hurting already from the laptop." Puzyreva responded, "Lot of money? We will get rich." Later, on or about January 20, 2023, Goltsev messaged Puzyreva, "Dasha [A co-conspirator's employee] paid. 700k." Notably, financial records revealed wire transfers totaling approximately $700,000 into an SH Brothers account on or about and between January 18, 2023 and January 26, 2023 from the Hong Kong-based Robotronix in connection with an order for OOO Testkomplekt ("Testkomplekt"). Testkomplekt is a Moscow-based electronic components distributor specializing in semiconductors and

---

[2] The defendant's text messages with Goltsev were in Russian. The transcript of her text messages herein are draft summary translations.

5

microelectronics that was established in or about 2016. Testkomplekt has held a variety of contracts with Russian military entities, including State Corporation Rostec, a Moscow-based defense conglomerate. On or about May 19, 2023, pursuant to Executive Order 14024, OFAC added Testkomplekt to its Specially Designated Nationals and Blocked Persons List.

In her own words, Puzyreva recognized how profitable their criminal scheme was. On or about May 16, 2023, in a discussion about work and a new client Puzyreva wrote to Goltsev, "we will be distraught when the income stops coming. We can't afford to relax."

Puzyreva's text messages show that she knew about the underlying export control scheme. Below are the defendant's text messages with Goltsev from on or about September 21, 2023 regarding a package seized by customs:

> Goltsev: A package got stuck at customs.
> Puzyreva: Oh God. Some curse is upon us.
> Goltsev: Yeah its f*cked dear.
> Puzyreva: from what date?
> Goltsev: Yesterday.
> Puzyreva: God, this was a cursed day. For whom?
> Goltsev: for sure. Dasha. I don't even know what will happen now.
> ***
> Puzyreva: What was the total of the package?'
> Goltsev: 40k.
> Puzyreva: Did you write to the Latino? What was in the package?
> Goltsev: not a very pretty part.
> Puzyreva: shit.
> Goltsev: yes, strange.
> Puzyreva: you gonna write to customs?
> Goltsev: no, not yet.
> Puzyreva: that's correct. Wait. They'll let it go.
> Goltsev: But it looks bad.
> Puzyreva: why?
> Goltsev: I just feel it

Below is a text message conversation between Puzyreva and Goltsev from on or about June 18, 2023:

> Goltsev: [sends article titled "Chinese Bank of China will limit the transfers of money from Russia to the banks of EU, USA, UK and Switzerland." ]
> Puzyreva: And what now
> Goltsev: I don't know dear. Transferring money is becoming more and more difficult."

6

Finally, below is a text message conversation between Puzyreva and Goltsev from on or about May 30, 2023, when discussing a drone attack in Moscow:

> Puzyreva: what is Putin waiting for. He needs to destroy Ukraine.
> Goltsev: yeah they're gonna get f*cked either way.
> Puzyreva: He needs to put fear into them. Those losers.
> Goltsev: Well the way he is acting they have the right to do the same.
> Puzyreva: I hate [ethnic slur for Ukrainians] anyway.

The defendant was arrested when she traveled to New York with her husband to meet with their co-conspirator Nasriddinov. Puzyreva was arrested with $20,000 in cash, which she has agreed to forfeit as proceeds of her crime.

II.    Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration, and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable. [The court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted). "When a factor is already included in the calculation of the [G]uidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or below the range must articulate specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the [G]uidelines calculation." United States v. Sindima, 488 F.3d 81, 87 (2d Cir. 2007) (quotation omitted, alterations in original) (superseded by statute on other grounds). "[W]here the sentence is outside an advisory Guidelines range, the court must also state 'the specific reason' for the sentence imposed, in open court as well as in writing – 'with specificity in a statement of reasons form' that is part of the judgment." United States v. Aldeen, 792 F.3d 247, 251-52 (2d Cir. 2015), as amended (July 22, 2015) (quoting 18 U.S.C. § 3533(c)(2)) (superseded by statute on other grounds).

Title 18, United States Code, Section 3553(a) provides that, in imposing a sentence, a court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; [and]

7

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C. § 3553(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts. To the extent there remain any open issues as to the correct Guidelines range, the Court should first make any necessary finding regarding the correct range. Nevertheless, however the Court arrives at the correct Guidelines range, it still must fashion a sentence that meets the criteria of Section 3553(a) under the specific facts of this case.

### III. Analysis

#### A. Sentencing Calculation

Probation calculated the defendant's offense level as category 17, as follows:

Money Laundering Conspiracy

| | | |
|---|---|---|
| Base Offense Level (§ 2S1.1(a)(2)) | | 8 |
| Plus: | Value of Laundered Funds $351,600 | +12 |
| Plus: | Convicted Under 1956(h) (§ 2S1.1(b)(2)(B) | +2 |
| Plus: | Sophisticated Means (§ 2S1.1(b)(3)) | +2 |
| Less: | Adjustment for Minor Role in Offense (§ 3B1.2(b)) | -2 |
| Less: | Zero Criminal History Offender (§§ 4C1.1(a), (b)) | -2 |
| Less: | Acceptance of Responsibility (§§ 3E1.1(a), (b)) | -3 |
| Total: | | <u>17</u> |

PSR ¶¶ 37-47. The government agrees that Probation's calculation of the value of laundered funds is correct. As stated above, in the Plea Agreement, the government used the amount of money personally attributable to Puzyreva in calculating the value of the laundered funds, leading to an estimated Guidelines calculation of 18 to 24 months, which was stipulated to by the defendant.

8

Probation correctly used the amount of money laundered by the conspiracy. Based upon this calculation, the defendant's advisory sentencing range is 24 to 30 months' imprisonment.

    B.  <u>A Guidelines Sentence Is Appropriate</u>

  The government respectfully submits that a Guidelines sentence of 24 months' imprisonment, which is within the Guidelines range estimated by Probation, is appropriate in this case. The sentencing factors articulated in 18 U.S.C. § 3553(a) underscore the need for a Guidelines sentence.

    1.  <u>The Nature and Circumstances of The Offense</u>

  As an initial matter, the "nature and circumstances of the offense" are serious. The defendant laundered profits from exporting electronic components and integrated circuits that play a critical role in the production of advanced Russian precision-guided weapons systems. Simply put, Russia cannot manufacture these parts itself. They need people like the defendants to lie to U.S. companies in order to make weapons.

  Russia's war on Ukraine is in its third year and it is worth noting a few of the remarkable facts about this devastating war, which has been fueled in part by the illegal activity of people like the defendant:

- "More buildings have been destroyed in Ukraine than if every building in Manhattan were to be leveled four times over."[3]

- More than 900 schools, hospitals, churches, and other institutions have been damaged or destroyed, the analysis shows, even though these sites are explicitly protected under the Geneva Conventions.[4]

- U.S. officials estimated that nearly 500,000 people had died over the course of the war as of August 2023.[5]

  According to the Department of Commerce, many of the electronic components and integrated circuits shipped by Puzyreva's co-conspirators were "of the highest concern due to their critical role in the production of advanced Russian precision-guided weapons systems, Russia's lack of domestic production, and limited global manufacturers." Some of the electronic components and integrated circuits with the same make, model, and part number shipped by the co-defendants through SH Brothers have been found in seized Russian weapons platforms and signals intelligence equipment in Ukraine, including radios that detect enemy cellular

---

[3] https://www.nytimes.com/interactive/2024/06/03/world/europe/ukraine-destruction.html (last visited Jul. 1, 2024).

[4] Id.

[5] https://www.nytimes.com/2023/08/18/us/politics/ukraine-russia-war-casualties.html (last visited Jul. 1, 2024).

9

communications, tanks, missiles, and drones. A just sentence will take into account the seriousness of the defendant's conduct.

### 2. Specific and General Deterrence

There is a need for both specific and general deterrence in this case. As to specific deterrence, the record suggests the defendant's primary motives for committing this crime was greed and animosity towards Ukrainian "losers," as she described them. It is worth noting that the defendant described her upbringing as "comfortable" "in which she never wanted for anything." The PSR describes Goltsev as "controlling" and "isolating" in relation to Puzyreva but the communications between the two of them demonstrate that Puzyreva was an independent actor, had agency, and understood what she was doing. A significant sentence is necessary to convey to the defendant that the perceived financial incentive of this criminal activity is outweighed by the significant consequences brought upon those who are caught. If the defendant were to receive a lenient sentence, then she may calculate that the financial rewards were worth the risk, and there will be a significant likelihood that she will resume this scheme with contacts in Russia, who remain at large. The fact that the defendant's conduct is also rooted in some sort of personal animosity towards a specific group of people also counsels in favor of a serious sentence that underscores that efforts to harm others will be punished.

Finally, there is a need for general deterrence. General deterrence is necessary because, unfortunately, as quickly as these prosecutions are brought, other procurement networks are setup to replace them and continue to support the Russian war effort. These procurement networks require an entire ecosystem of individuals and businesses to succeed—from the individuals who agree to acquire the goods, to the companies that sell the goods, to the freight forwarders who export the goods, to the banks that process the transactions. A significant sentence will send a powerful message to each of these links in the chain and warn them that participating in the illegal export of goods to Russia will result in imprisonment and other consequences. Indeed, even those entities and individuals who may not have been aware that their conduct was in violation of the law are more likely to engage in rigorous review of transactions and other compliance activity if they know that the failure to do so may result in serious criminal consequences.

IV. <u>Conclusion</u>

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 24 months' imprisonment.

Respectfully submitted,

BREON PEACE
United States Attorney

By: /s/
Artie McConnell
Ellen H. Sise
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of the Court (LDH) (by ECF and E-mail)
Defense Counsel (by ECF and E-mail)