**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| vs. | ) | Docket No. 23CR00452-003(LDH) |
| | ) | |
| **Kristina Puzyreva,** | ) | **DEFENSE SENTENCING MEMORANDUM** |
| | ) | |
| **Defendant.** | ) | |

Kristina Puzyreva ("Ms. Puzyreva"), by counsel, files this Sentencing Memorandum setting forth factors the Court should consider in determining what type and length sentence is sufficient, but not greater than necessary, to comply with 18 U.S.C. § 3553(a). Based on her minimal involvement in this case, her husband's sway over her, her complete lack of any prior misconduct and the arduous conditions she has already endured, the defense asks Ms. Puzyreva be sentenced to time served on Count 7.

## I.      FACTUAL BACKGROUND

### A.      <u>The Instant Charges</u>

The instant case alleges a conspiracy among seven named defendants to transfer funds outside the U.S. to smuggle goods to Russian entities to evade U.S. export controls. Count One alleges a conspiracy to defraud the U.S. by obstructing export controls, in violation of 18 USC 371.  Count Two alleges a wire fraud conspiracy by their scheme to defraud U.S. companies under false pretenses, in violation of 18 USC 1349. Counts Three through Six allege actual wire fraud by multiple wire transfers made under false pretenses. Count Seven alleges transfer of funds to conceal their intent of carrying out unlawful activities, in violation of 18 USC 1956. Count Eight alleges a willful conspiracy to violate the Export Control Act, in violation of 50 US 4819, and related federal regulations. Count Nine alleges actual violation of the Export Control

Act and related federal regulations.  Count Ten alleged filing of false electronic export information in violation of 13 USC 305. Related criminal forfeiture counts were included.

**B.**  **The Offense Conduct**

Ms. Puzyreva's individual role was minimal in this conspiracy. The primary named defendants were involved a coordinated plan to obtain U.S.-sourced electronic and other componentry with military application, to send to Russian defense entities via third party companies, in violation of U.S. export control forbidding sale of such materials to Russian entities. Defendant Nickolay Goltsev is a dual national of Canada and Russia and is the husband of Ms. Puzyreva.

Goltsev was purchasing coordinator for an electronics company in Montreal, Electronic Network, Inc., which was on the U.S. export controls list. Goltsev had been purchasing electronic components for Russian military end users for over twelve years (well before he was married to Ms. Puzyreva). Three other co-defendants – Chernikov, Zenchenko and Vetoshkina – were Russian nationals living in Russia working for Testkomplekt and Radioavtomatika (also on the U.S. export controls list). Bochkarev, a Russian national, worked for  a United Arab Emirates company, Suntronic, that fronted for multiple Russian entities. Co-defendant Nasriddinov, a Russian and Tajikistan national, lived in Brooklyn NY and headed two other front electronic companies there, SH Brothers Group Inc. and SN Electronics. He worked closely with Goltsev.

The United States places certain components critical to Russian war efforts on a high priority export control list. An exporter is required to file Electronic Export Information where an export license was required, accurately describing the component and the entity receiving it. Bochkarev, Chernikov, Vetoshkina, and Zenchenko received orders from Russian military end users for particular items or parts from the United States. They sent the requests to Goltsev and

Nasriddinov, who sourced and purchased these items by misleading these companies as to how the items would be use and identities of the Russian end users. Goltsev and Nasriddinov received the items generally in Brooklyn and repackaged them. They sent the materials to intermediary companies in Turkey, Hong Kong, China, India, the UAE, and elsewhere. Goltsev and Nasriddinov had to falsify electronic filing information with the Department of Commerce to achieve this illegal redirection of the components. They also had to set up fraudulent bank accounts for Nasriddinov's two Brooklyn companies to process and transfer funds.

Kristina Puzyreva's role in this conspiracy was extremely limited. She set up two New York bank accounts to make financial transactions as directed by Goltsev. Goltsev told her how to set up the accounts and controlled them after they were established. These accounts showed cash deposits in Brooklyn corresponding with trips Goltsev made to meet with Nasriddinov. They do not show who made these deposits. As discussed below, Ms. Puzyreva devoted the vast majority of her time to her extremely challenging job at an elite international clothing company.

Ms. Puzyreva's involvement otherwise was minimal. **The government, U.S. probation and defense agree that, as stated by Probation:  "Although Puzyreva financially benefited from her involvement in this scheme, her role appears to be limited to opening the bank accounts utilized to structure cash deposits to launder the proceeds of the scheme. As such, a minor role reduction is warranted."  PSR ¶ 30.**

It its Sentencing Memo of July 8, 2024, the government attempts to circumvent its own position by describing Ms. Puzyreva's role as "critical," that she was a "Linchpin." Govt Memo at 5."  Yet the government has already conceded she played a minor role. A minor participant is, by definition, never a linchpin. The only conduct directly attributable to Ms. Puzyreva is the opening of the two accounts. These and other significant government misstatements are

3

discussed more fully below.

**C.      Plea Agreement and Probation Recommendation**

Ms. Puzyreva agreed to plead guilty to conspiracy to commit money laundering in Count

Seven. The Guideline calculation in the plea agreement set a base offense level of 8 under USSG

2S1.1.  Ten levels were added for loss over $150,000. Two levels each were added for money

laundering and for use of sophisticated means. Two levels were removed for minor role.  Two

levels were removed under the new, zero-point offender guideline. The total adjusted offense

level was 18. Full acceptance of responsibility further reduced that level to 15. Ms. Puzyreva also

agreed to forfeiture of specified amounts and items of property. In Criminal History Category 1,

level 15 provides a range of 18 – 24 months. The government assigned loss of funds personally

attributable to Ms. Puzyreva. Probation assigned the value of laundered funds as simply the

forfeiture amount which exceeded $250,000. It therefore assigned 12 levels under 1S1, with a

final adjusted offense level of 17, and a range of 24-30 months. **Again, Probation**

**unambiguously stated:**

> **Due to her limited involvement and scope of knowledge of the underlying**
> **conduct within the scheme, Puzyreva represents a minor participant. Although she**
> **personally profited from her involvement, she had no input or control over the**
> **underlying conduct. As such, the offense level is decreased by 2 levels under USSG**
> **§3B1.2(b).**

**PSR ¶ 31**.

Goltsev pled guilty on July 9, 2024. His sentencing range under his plea agreement is 33-

41 months.  The obvious inequity between such similar sentencing ranges, for two defendants

who played vastly different roles, is discussed further below.

**D.      Defendant Background**

Ms. Puzyreva was born in Omsk, Russia in 1991. Omsk is a large port city in eastern

Siberia. In the 18th century, Peter the Great sent prisoners and convicts to the area; even after its development as a hub for the Trans-Siberian railway, and later as a petroleum refinery center, it was associated with isolation or punishment. Fyodor Dostoevsky spent five years in exile there. Its transition to market economy after Perestroika was difficult. Unemployment was widespread. The limited economic benefits of its petroleum industry evaporated when its main refinery relocated to St. Petersburg. Russian deindustrialization in the 1990s increased rates of alcoholism, substance abuse and domestic violence, rates particularly high in Omsk.[1]

### *Upbringing*

Against this background, Ms. Puzyreva was born in 1991 to Igor Puzyreva and Sneszana Puzyrana (nee Bletneva). Mr. Puzyreva owned an agricultural business, which he struggled to maintain. He traveled frequently and was gone from the household for long periods of time. As was epidemic among males of this era, Mr. Puzyreva drank to excess. Rates of alcoholism in the Omsk region, and in particular use of *Samogan*, a home-made distilled spirit with alcohol content of 40 % or higher, greatly exceeded the national average.[2] Self-harm and suicide rates were abnormally high among men in these years, at their highest in Siberia.[3]

Sneszana Puzyrana is originally from Vladivostok, born there in 1970. She is half Ukrainian. Her mother is 100% Ukrainian. This geographical area has a strong ethnic Ukrainian identity. At the time of the Russian Revolution, this area, known as Green Ukraine, attempted to secede. At the start of the 20th century, 70% of the population identified as Ukrainian. Ms. Puzyreva was very close to her maternal grandmother and shared her Ukrainian affinity. (Her

[1] Sweet, E., *Ethnographic Understandings of Gender and Economic Transition in Siberia: Implications for Planners and Policy Makers*. European Planning Studies, 17(5), 697–713. https://doi.org/10.1080/09654310902778102.
[2] Zaigraev, G, *"The Russian Model of Noncommercial Alcohol Consumption,"* Ch. 3, Moonshine Markets: Issues in Unrecorded Alcohol Beverage Use, ed, A. Haworth and R. Simpson, p. 35.
[3] Bellman V, Namdev V., *Suicidality Among Men in Russia: A Review of Recent Epidemiological Data*. Cureus. 2022 Mar 9;14(3):e22990. doi: 10.7759/cureus.22990. PMID: 35415026; PMCID: PMC8992693.

social media as an adult supported Ukraine, for which she would later be criticized in Russian press).

The Puzyreva home environment experienced the domestic abuse that often accompanies reduced socioeconomic conditions. Ms. Puzyreva frequently hid from her father for fear of beatings. Her father was violent towards her mother; Ms. Puzyreva would sometimes literally get between her mother and father to try and stop her father from beating her mother. See A1.[4] Sneszana Puzyreva studied law but ultimately did not work outside of the home and was completely dependent on her husband. She would try to leave but always ended up returning home because she could not financially support herself and her daughter.[5]

*Education*

Sneszana concentrated her attention on her daughter. She encouraged in her daughter a single-minded focus on education. She pushed Ms. Puzyreva to invest in education and to attend school abroad if it would provide a higher quality education. Mother and daughter developed a strong bond. Ms. Puzyreva graduated from high school in Russia in 2009. At age 17, she relocated by herself, without any of her family assisting her, to Canada. She attended Fraser International College and then British Columbia Institute of Technology in Burnaby, British Columbia, from 2009 to 2011. Ms. Puzyreva obtained a certificate in event planning from Vancouver Community College in 2014. She developed an aptitude with languages, becoming fluent in French and English.[6] Ms. Puzyreva achieved these educational goals completely on her own initiative.

---

[4] The Attachment to this Memo contains letters and other documents and is cited herein as "A_."
[5] Ms. Puzyreva's parents separated after she moved to Canada but stayed in contact. Currently both reside at Ms. Puzyreva's home in Montreal to help care for her home and pets. Ms. Puzyreva remains very close to her mother
[6] Her mother notes: "From the age of four, she began to learn English. As it turned out, she has an aptitude for languages, later it became Kristina's main hobby. We sent her to study in England, Canada, Europe, where she improved her skills." A1.

*Employment*

Ms. Puzyreva started working in 2016 as a sales assistant at a specialized textile company. She was also a buyer's assistant, obtaining new collections to be added to the store. She worked from 2017 to 2020 as a logistics coordinator for another textile company (Domestic Converters/Climawear). There, she handed accounts and managed sales of their products to big brands like Walmart. After a period of unemployment during the pandemic, in 2021 Ms. Puzyreva started working for a clothing company called Psycho Bunny. She worked there until her arrest in October of 2023.

Ms. Puzyreva's work duties at Psycho Bunny were substantial. Psycho Bunny is a very large company with almost 600 employees. They sell elite fashion apparel online and at brick and mortar locations. Their headquarters are in Montreal with a strong staff presence in New York City. They have about thirty in the U.S and eight stores in Canada. They had revenue over $18 million in 2024. Ms. Puzyreva handled all accounts receivable for the company's U.S. and Canadian accounts. She had extensive direct customer contact. She later moved into production as well, starting management functions there. She was the assistant to all U.S. sales representatives, to make sure stock was available for their orders a week. She worked 60-65 hours weekly. Her responsibilities were extensive, and she focused on them intensely. As one neighbor notes,

> Her dedication to work was impressive – she was not a quitter. She had expressed concerns at work to me; she felt that a co-worker was taking advantage of her good will and kindness. He would have Kristina take on his responsibilities that were not in her job description but rather his and then take credit for it.  I expressed my feelings and advised her to elevate this to management, but Kristina dug in, took on the challenge often worked well past her cut off time into the night to ensure that the job was always done to the best of her abilities.

A3. She also helped friends with their side businesses, such as selling French bulldogs, or a

7

specialized balloon bar. She loved her job. Ms. Puzyreva showed the same dedication to her

work as she had to her education. As another friend notes, "she was hardworking, dedicated

and never left a job unfinished." A8. Ms. Puzyreva routinely received bonuses and

promotions.

### *Marriage*

Ms. Puzyreva first met her future husband, Nikolay Goltsev, in school in Vancouver in

2009. They did not start dating until 2014. It was her first serious relationship. They married in

January of 2015.  Ms. Puzyreva was attracted to Goltsev's kind attitude towards her. She viewed

him as a problem-solver. They relocated to Montreal. Ms. Puzyreva was very dependent on

Goltsev at first because she did not have language fluency.

Ms. Puzyreva exhibited in her marriage the reticence and deference she saw her mother

demonstrate in her childhood towards her father. To varying degrees, male dominance was

entrenched in Slavic culture.[7] Sneszana Puzyreva refers to it as "a certain sacrifice, [the]

feminine trait of a Slavic woman." A1. In the years since her marriage, Ms. Puzyreva became

increasingly under the influence and control of Goltsev. What started out as preferences became

demands:  who she could see, what friends she could keep, what activities she could engage in

by herself – even details such as her attire became subject to his control. The discovery in this

case includes texts messages from Goltsev to Kristina, telling her what she can or cannot do.

They are highly manipulative. For example, this two-hour exchange occurred on October 8, 2022

when Kristina wanted to go to a spa with a girlfriend (Goltsev's voice is italicized):

---

[7] Levant, R. F., Cuthbert, A., Richmond, K., Sellers, A., Matveev, A., Mitina, O., Sokolovsky, M., & Heesacker, M. (2003). *Masculinity ideology among Russian and U.S. young men and women and its relationships to unhealthy lifestyles habits among young Russian men*. Psychology of Men & Masculinity, 4(1), 26–36; Petrone,  K., *Gender, militarism, and the modern nation in Soviet and Russian cultures,* ed. K. Fábián, The Routledge Handbook of Gender in Central-Eastern Europe and Eurasia, Ch. 9. https://doi.org/10.1037/152.

| |
|---|
| I love you very much. |
| *No* |
| It is just that sometimes I want to socialize with girls. |
| Once in a couple of months. |
| I don't have girlfriends, |
| and nobody. |
| *Sunday night go for it* |
| It consumes me. |
| *It's your call* |
| You have to understand it. |
| I am crying because of that. |
| I want to be with the girls. |
| *It's ok do what you need to do* |
| *Be with them* |
| I don't go to the night clubs, though. |
| *Not with me* |
| Bunny, you are everything for me. |
| *You can go to the night club as well* |
| *I don't feel that any more* |
| *Do whtever you want* |
| *You hurt me and upset me* |
| *But what matters is you being happy on Sunday night* |
| Bunny |
| I don't conceal anything from you. |
| I am telling you: "Come with me, |
| If you wish." |
| Sometimes I want to socialize with people |
| *No I want to go with you but now with random people* |
| *I feel we are growing apart sometimes* |
| But we have to start with something. |
| *You don't feel me anymore* |
| Bunny |
| *It's ok* |
| I love you and all my life is around you. |
| *Sorry for being so emotional I was hurt and upset* |
| [Around] you. |
| *You do what you want to do* |
| Is it so difficult to understand me? |
| Sometimes I want to chat with girls |
| Just for no reason. |

(cont'd in next column)

| |
|---|
| *You will have the time of your life* |
| I understand that in the evening it was a little late, but it will never happen again |
| *You can do whatever you want* |
| Why are you hurting me? |
| Cat, it's egotism |
| I am all yours |
| *Egoism it's you leaving me alone on Sunday night* |
| *Babe I don't want to discuss it anymore* |
| Little Cat, I will take a day off and we will be together. |
| *Go have fun* |
| You don't need to take a day off for me. |
| Please don't get offended, Cat. |
| *It's ok* |
| I never go out anywhere. |
| I have a depression. |
| *You do what you want to do* |
| I am crying. |
| Please don't be mad. |
| I need it sometimes, but rarely. |
| *Babe I do t mind you going but on Sunday night …* |
| Please understand. |
| *Thank you* |
| *I understand that I will spend thanksgiving by myself* |
| Why? |
| The most important is that you would have fun. |
| *10 thanksgiving* |
| Cat, stop it. |
| *It's ok* |
| *I don't wanna talk about it* |
| *You don't really care about me and my feelings* |
| *You knew what my reaction would be but you still did it* |
| *Enjoy* |
| *With a person you saw once in your life* |
| Cat, |
| I don't want to go anywhere anymore. |
| *Babe I wanted to keep it to myself but I couldn't I am sorry it was just upsetting a lot* |
| Honestly, I always got rid of everyone and nobody wants to make friends with me. |
| *To be left alone on Sunday night* |
| *But who cares* |

9

| |
|---|
| *Enjoy your time* |
| Little Cat, I know it's late. Let's go with me, my dear. |
| *She is single* |
| Don't I invite you? |
| I am always with you. |
| *I don't want to deal with random people* |
| She is an adequate one. |
| *I don't feel you anymore* |
| *It's your choices in life* |
| Thank you. |
| I live for you. |
| And to hear something like that! |
| You are my air. |
| And my life. |
| *I don't want to talk about it any more* |
| My dear, excuse me if I offended you. |
| I didn't want to do it. |
| But people go to the spa to have a romantic time not to meet with a random person |
| I always want to be next to you. |
| Forever. |
| *No it's not true* |
| My Little Cat, my Bunny. |
| *It's ok* |
| Well, if you wish, I will not go there. |
| *No you do what you do* |
| If it upsets you so much. |
| Or let's go together. |
| *I got it already* |
| Once in a lifetime, I did something without you and all this resentment! |
| Honestly, I understand you. |
| I will never be so late. |
| *Do what you want to do* |
| You don't need to adjust it with me. |
| I want to have girlfriends |
| Sometimes |
| And the three of us can socialize |
| I have nothing to conceal |
| *I do t mi s you having friends and spending time with them* |

(cont'd next column)

| |
|---|
| *But going with a spa with a. Person you saw once and leaving me alone on Sunday night* |
| *It's upsetting* |
| *And says a lot about what I am to you* |
| *The fortuneteller was right.* |
| What do you mean? |
| *Nevermind* |
| Thank you, Bunny. |
| *Enjoy your thansgiving with your friend* |
| You ruined my mood. |
| I don't want anything and to go anywhere anymore. |
| You enjoy when I am depressed. |
| *I didn't you acted in a selfish d careless attitude to me I would never do smth like that* |
| *Babe, they will call you anywhere,* |
| *and you will run.* |
| No |
| *If you lack communication , I do t mind it at all but I do t feel good to be abandoned on Sunday night,* |
| *Surround yourself with single people* |
| *Who care about themselves only* |
| *One day you will become one* |
| *You are like your mom* |
| *Who lives only for herself and does everything that she wants* |
| *Sorry babe* |
| *You really hurt me today ... not just upset* |
| *I thought you are different* |
| *But you care for your random people more than for me* |
| No |
| I don't want to go anywhere, honestly. |
| *Nevermind babe* |
| Little Cat, I honestly live for you. |
| *I don't want to ruin anything* |
| *A feel guilty yes I do* |
| *It is what it is* |
| I don't want to go to the spa. |
| *It's ok I really dont wanna talk about it anymore* |
| Honestly, I don't know why I agreed [to do it] |
| *For me it's to step out of comfort zone* |
| *I don't want talk about it anymore really* |
| *Sort it out with your comfort zones and friends by yourself.* |

In another chat, he tells her she looks fat. In another, he tells her she is acting like a teenager when she posts a selfie in a new dress. His messages continue in this insidious tone.

All the money she earned went to Goltsev for his control. Even funds Ms. Puzyreva received from her parents when to Goltsev. When they bought her a car, Goltsev insisted it be held in his name. The house they bought was held in his name alone as well. She went along to get along, just as she had seen her mother do. Ms. Puzyreva has an innate kindness that blinded her to the growing insidiousness of Goltsev's control. But, as described further below, it was clear to many of those around her, even casual neighbors and friends. And it ultimately led to her involvement in the instant case.

## II.     ARGUMENT

### A.     The Sentencing Criteria

Courts, and parties in the criminal justice system, are now quite familiar with the post-Booker sentencing universe. The U.S. Sentencing Guidelines are used to first establish the benchmark of a reasonable sentence might be, including analysis of any departures. *Gall v. United States*, 552 U.S. 38 (2007). But a Guideline sentence is not presumptively reasonable. Id. Instead, the court must look to the five sentencing criteria at 18 U.S.C. § 3553 to ultimately determine what sentence best serves the penological goals at § 3553(a)(2):  just punishment, deterrence, public protection, and rehabilitation. The court must evaluate: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, the kinds of sentences available (including Guideline range and policy), unwarranted sentence disparities among comparable defendants, and any need for victim restitution. 18 U.S.C. § 3553(a). See *United States v. Singh*, 877 F.3d 107, 116 (2d Cir. 2017).

Above all, "[i]t has been uniform and constant in the federal judicial tradition for the

sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). "[A] sentencing judge must have a "generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2017) (quoting Guido Calabresi, *What Makes a Judge Great: To A. Leon Higginbotham, Jr.*, 142 U. Pa. L. Rev. 513, 513 (1993). For the reasons set forth below, this sentiment is particularly relevant in Ms. Puzyreva's case. A variance sentence of time served meets all the statutory sentencing criteria and should be imposed in this case.

**B.**     **Nature and Circumstances of the Offense**

Ms. Puzyreva fully appreciates the seriousness of this offense. U.S. export controls are critical to keep vital military components out of the hands of aggressors. Her statements at her guilty plea demonstrate her full acceptance of responsibility. She appreciates she is responsible for her conduct even where the government and Probation agree she did not have full knowledge of the scope of this conspiracy and certainly did not have control over it. But her punishment should also reflect these facts.

**C.**    **Relative Role in Offense/Comparable Sentencing**

In its sentencing memo, the government grossly overstates Ms. Puzyreva's role even as it technically concedes she played a minor role.  The government recommends a 24 month sentence for her – the top of her Guideline – even as Goltsev receives a plea range of 33-41 months. This makes a mockery of the bedrock principle of comparable sentencing for relative culpability.

The Second Circuit has made clear the criteria for a minor role adjustment:

(i) the degree to which the defendant understood the scope and structure of the criminal activity;
(ii) the degree to which the defendant participated in planning or organizing the criminal activity;
(iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
(v) the degree to which the defendant stood to benefit from the criminal activity.

*United States v Soborski*, 708 F App'x 6, 10-11 (2d Cir 2017), citing U.S.S.G. § 3B1.2 cmt. n.3(C). When a minor role adjustment is granted, those criteria have been evaluated and determined, in totality, to support the adjustment. See *United States v Wynn*, 37 F.4th 63, 69 (2d Cir 2022). In *Soborski*, the Second Circuit held a defendant may play a minor role even if their role was essential. The issue is whether that defendant was "substantially less culpable than the average participant in the conspiracy." Id.

The government refers to Ms. Puzyreva as a "linchpin" because she performed what they claim was a critical function. But that is exactly the position rejected in *Soborski.* The evidence the government cited in their memo does not show any significant culpability on her part.  Ms. Puzyreva was signatory for two New York accounts, but there is no evidence she thereafter made deposits or any other transactions in those accounts. Goltsev did.

The government references five text messages between her and Goltsev allegedly relating to conspiracy matters: whether a package had gotten through, payments, expectation of profit. Govt Sent. Memo at 5-6. But discovery submitted by the government to the defense includes <u>tens of thousands</u> of messages amongst the conspiracy members and with dozens of entities they were dealing with. Amongst this <u>enormous</u> amount of data, the government can point to five text messages showing Ms. Puzyreva's involvement. There is no communication between her and the

13

chief participants and players in this conspiracy. Ms. Puzyreva has acknowledged her guilt and her knowledge of her husband's activities. But nowhere did she admit to substantial involvement in, or even extensive knowledge of, the conspiracy. And the government can mount no evidence to show it.

Nowhere is the absurdity of the government's sentencing recommendation for Ms. Puzyreva more evident than in comparison to Goltsev's sentencing range. Goltsev is clearly a conspiracy leader. He has been engaged in this smuggling operation for over a decade, since before he started a relationship with Ms. Puzyreva. He co-manages with Nasriddinov the two U.S. businesses that front the entire smuggling apparatus. He is in regular contact with the Russian co-defendants, and other entities in the scheme, to arrange transport routes to the Russian end-users. He is making decisions about what gets sent where, how to evade restrictions, how to code items – all the intricacies of managing a complex scheme to elude U.S. export controls. Yet Goltsev receives in his plea a sentencing range of 33-41 months! Questions of relative culpability are integral to the § 3553 sentencing scheme. See *United States v Constantine*, 2023 US Dist LEXIS 16396, at *8 (SDNY Jan. 31, 2023, No. 21-CR-530 (SHS)). The proper comparison is relative culpability among the defendants in the case. *United States v Kumankumah*, 751 F App'x 79, 82 (2d Cir 2018). Ms. Puzyreva is substantially less culpable than any of the other defendants in this case, especially Goltsev. A variance sentence for Ms. Puzyreva of time-served appropriately allocates this relative responsibility.

The government also attempts to show Ms. Puzyreva was motivated by anti-Ukrainian animus, and intentionally trying to aid Putin. Govt Memo at 7. This contention is ludicrous. First, there is no clear evidence establishing Ms. Puzyreva even knew Russia was the intended end-user. But more to the point, she had no great love for Russia. She had not returned to Russia once

since she left. All her visits with her mother in the interim had been in other countries. She was of Ukrainian heritage herself and publicly identified with it on her social media. She was deeply devoted to her Ukrainian grandmother. In text messages the government ignores, Ms. Puzyreva makes clear her sympathy for the Ukrainians fighting Russian aggression. E.g., October 31, 2022: it is "disgusting that 80% of Kyiv is without water;" again, on November 23, 2022: agreeing it is disappointing to be Russian when this aggression exists. The government deliberately slants and misrepresents the evidence to support its extreme sentencing position.

**D.    <u>The History and Characteristics of the Defendant</u>**

*<u>Impeccable Background and Reputation</u>*

Ms. Puzyreva has absolutely no prior involvement with law enforcement. She has never been in trouble in her life. She followed the path her mother set for her: to work hard, focus on education, and build a successful domestic life. She did not actively or enthusiastically participate in her husband's criminal activities. She had only tangential knowledge before Goltsev took her to New York.

Ms. Puzyreva is an extraordinarily kind person, recognized by all as empathetic and giving. She has had an outpouring of support from friends, family, neighbors – even from fellow inmates who recognize in her a special gift of giving. Her cousin Anastasia Veronskaya, who grew up with Kristina, says Kristina:

> kept [her] going with her positivity. When I had problems at work, thanks to her moral and financial support I was able to leave and she helped me until I found a new job.... [S]he is very sympathetic and friendly. She never spoke badly about anyone,.... She is a very hardworking and responsible person. She loves animals and people, she always helps people in need. She donated to poor people, people in difficult situations. She appreciates her friends and the most important thing for her is her family.

A6. Another cousin, Margarita Anderson, states: "We were raised in Russian traditions. We were taught to respect our elders, honor laws, help people and be polite.... [Kristina]

is a very kind person. She is very hardworking and always helps people in difficult times

of life." A7. Her friend of ten years, Olga Skorik, writes:

> Kristina Puzyreva is an extraordinary individual dedicated to her family, home and our neigh[borhood] community. Her caring nature extends not only to her family but also to her pets, demonstrating a deep sense of responsibility and compassion. Within our community, Kristina is admired for being a friendly, open and kind-hearted person. During the early stages of my entrepreneurial journey, Kristina Puzyreva played a significant role in helping me establish my business. She generously offered her expertise in creating marketing content, contributing significantly to the success of my venture. Her selflessness and support were instrumental in my path to financial stability.

A5. A former coworker of eight years, Nadejda Calaras, states Kristina "operates with

integrity and never has a bad word to say to anyone....

> As a colleague, she was hardworking, dedicated and never left a job unfinished. On a personal level, Krystina was trustworthy and carrying. She helped me with good advises and showed a significant amount of support when I had family problems and lost my job due to Covid. She helped me with job searching, sharing interview tips and career opportunities. She made me believe in myself and I am very grateful to her for that. I also saw how she was treating poor people, always donating them food, clothes and good positive vibes.

A8.  Montreal entrepreneur and hotel owner Turgay Demirdogan has known Kristina for a

decade. He praises her effusively:

> Kristina can be described as an exemplary individual. Her honesty, sincerity, and helpfulness are evident not only to me but to everyone around her. Our friendship has grown stronger over time, and we have developed a supportive relationship. Justice and honesty have always been present in Kristina's life. Her goodwill, dedication, respect, and love for those around her have always been admirable to me. Every moment spent with her has further clarified the depth and beauty of her character.

A9.
> Those in Kristina's neighborhood feel the same. Angie Helie Gery became very close

with Kristina soon after they moved to Montreal.  Her comments provide a special picture:

> [Kristina] has always been someone that was supportive, caring, loving, kind, generous and gentle. In all the years that I have known her, I have never seen any kind of malicious behavior, she is the type of person that can light up a room when she walks in, and people are just drawn to her positive energy. Once you know Kristina, you want to remain her friend, she has a heart of gold, and she is very kind....[She always thought of my

16

children.] She had this thing where she would make a gift basket, ring our doorbell, leave the gifts at the door, and then run back home without us seeing her, she was funny that way.  If she didn't have time to buy a gift, she would gather items around her home and place it in a gift basket.  It made me laugh because she would take anything worth giving as a gift, she wanted to make sure that you were thought of.

   At my wedding, Kristina was my maid of honor. Once the vows were said, she pulled out a bottle of wine and several wine glasses so that everyone that was there would have a glass of wine to celebrate this moment. I had chosen Kristina as my maid of honor because she was the one friend that was always there when I needed a friend, and we were very close.

A10. Ms. Gery's husband, Jason Zuckerman states:

Kristina was the most generous, giving, kind heated person. Every single Birthday in our family or Holiday she would always buy us a bunch of gifts and makes a cake or other baked goods. She even on numerous occasions would leave a cake or other things on our doorstep and then text us to look outside. If she knew somebody was sick in my household, no questions asked she would be standing at our front door with chicken soup or something else to help us. This was all done out of the goodness of her heart and never expected anything in return

A12. Retired biotechnologist and neighbor Doreen Harcus perceived Kristina as a "vibrant, sweet young woman, who was always very friendly, kind and respectful.... I often sensed Kristina's concern for me as I live alone...." A14. Neighbor John Stebe states he developed a strong bond with Kristina even though he is very guarded about whom he becomes close to.

I began to develop a stronger bond with Kristina[. M]y guard came down and [I] welcomed her into my circle and family which I rarely do. It was her personality of thoughtfulness and sincerity that planted the seeds of our friendship that I will honor for the rest of life. During the Spring of 2023 I had contracted Covid. Since I am single Kristina took the liberty of baking me a homemade cake represented from her country and added a get-well package left on my front steps. I had no idea or expectations of what she was doing but then received a text from her asking me to look outside my front door with a smiley Emoji.

A3.

### *Childhood Abuse*

The abusive family environment Ms. Puzyreva faced as a child, and the role model she saw of a wife's duty to acquiesce to male control, are directly relevant to this Court's evaluation of a just sentence in her case.

17

The effects of childhood trauma stay for a lifetime. They produce an array of post-traumatic stress symptoms, often criminogenic.  See *United States v. Brady*, 417 F.3d 326, 333 citing pre-*Booker* authority in *United States v. Vela*, 927 F2d 197, 199 (5th Cir 1991) ("Childhood abuse and neglect are often present in the lives of criminals. They always affect their mental and emotional condition."). This Court recognizes the relevance of such factors in sentencing. See, e.g., *United States v. Ross*, 2022 US Dist LEXIS 66888, at *3 (S.D.N.Y. Mar. 25, 2022, No. 15-cr-95 (AJN)) (defendant's troubled childhood marked by violence and poverty warranted below-Guidelines sentence). They are relevant here. Ms. Puzyreva witnessed her father beat her mother so viciously that she sought to separate them with her own body. She herself hid from him. Her mother attests to this:

> Unfortunately, when we were young, her father repeatedly raised his hand against me in her presence, he was a jealous man. There were moment when Kristina had to come between us to stop the conflict. Unfortunately, this behavior was considered the norm at the time. Over time, you begin to get used to any norm and think that this is normal. The family model she saw, unfortunately, I think had a certain influence on her.

A1. And this abuse occurred in a historically isolated region, at a time when decades of established social norms and economic structures were collapsing around them. It was a highly unstable period in a home controlled by an unstable patriarch. Ms. Puzyreva's mother responded by casting all her attention on her daughter: to develop in her the education and skills to hopefully have her own autonomy. She was successful – to a degree. But she did not anticipate the role Goltsev would play.

### *Goltsev Control and Manipulation*

Another factor for the Court to consider at this sentencing is the degree of control Goltsev exercised over Ms. Puzyreva. This control was evident to those around them. Her

18

cousin Margarita notes: "Kristina loved her husband Nikolai very much, and in my opinion, he took advantage of Kristina's kindness and love. He manipulated Kristina as he wanted. Kristina unconditionally believed and obeyed her husband, which led to sad consequences." A7.

Jason Zuckerman witnessed this control very explicitly:

> What happened to [Kristina] is a terrible thing, but I truly believe that Kristina would NEVER do anything knowingly. She is a straight shooter and there is no bad in her at all. We know her well enough to know the real her and what happened was not the real her. We hung out with her and Nick a lot. It was probably in the first few months that my wife and I realized that if it wasn't for her, we would not be friends with the couple. We liked her. Nick, we liked but it wasn't the same. She seemed to really love him a lot, but love can be blind. My wife and I did notice one thing whenever they were over. Kristina would either say something or do something or even eat something that her husband didn't like. Every single time I would see and hear he would start to get angry inside. His face changed and he would start mumbling something to her in Russian which I didn't understand. Kristina would continue after but look frustrated and she would completely switch topics. I always discussed this with my wife whenever they were gone, and we both felt like he controlled her and that she was like his puppet. No matter what though she always listened to him and what he said. She he may have even been afraid of him.

A13. So did neighbor John Stebe:

> I do feel Kristina's naivety contributed to her involvement [in this case.] I have not spoken about her husband Nikolay Goltsev but do want to add an incident that occurred in September 2023 that gave me reason to pause. Kristina had passed by my home if I recall dropping something off – We had been sitting on my front steps sharing a couple of glasses of red wine chatting about nothing important but enjoying each other's company. Kristina received a text that she looked at. As time went on maybe another 10-15 minutes she received another text – it was from Nick. Kristina said she needed to leave right away. I later asked what was wrong and was told Nick was upset with her for spending the 20-30 minutes at my home and [she] got into trouble. I was surprised to hear this as Nick was a friend of mine as well and was present during every other encounter I had with Kristina and him. It did not appear that Kristina went out a lot with her girlfriends on her own, Nick and Kristina were always walking their dogs together – I never saw Kristina walk the dogs alone. We live in a very secure and quiet community. I do not recall a lot of people coming to their home for dinners except for their neighbors who lived up their street and one couple who live in the next town over and myself. Nick expressed more than once to me that he did not have a social network.

19

A3. Even Doreen Harcum, who knew Kristina somewhat more casually, sensed her vulnerability: "I remembered once remarking to my own children how I felt she was somewhat naive or gullible and wonder now if that naïveté played a part in the actions that led her to this." A14. A sampling of the text messages between Ms. Puzyreva and Goltsev show his clear manipulation. Goltsev characterized all her socialization with others as a rejection of him. He monitored her every movement. He personally ridiculed her. His manipulation and humiliation of her is sickening.

The Second Circuit has recognized that a defendant's emotional and psychological manipulation by another is relevant to sentencing. E.g., *United States v Brady*, 417 F3d 326, 335 (2d Cir 2005).  Even where a full downward departure may not be warranted, such manipulation may support a lower sentence. Id. It is clear Goltsev dominated Ms. Puzyreva and this domination contributed to her participation in this offense. This should factor into her sentencing.

**E.**     **Deterrence/Rehabilitation**

Ms. Puzyreva has and will continue to experience for the rest of her life profound negative consequences from this conviction. The case has received widespread publicity worldwide. She has been cast as a co-equal basis with the other conspirators even though she is not. Her future opportunities will be limited. This black mark is a significant punishment and deterrence to future misconduct.

But Ms. Puzyreva's character is such that she is highly unlikely to recidivate in any manner. She has never been in trouble before. She has worked hard her entire life both to educate herself, to obtain professional jobs and to be successful in them. She did so largely on her own, after a desolate childhood. She is incredibly well-regarded by colleagues, friends and neighbors –

20

all of whom consistently note her unselfish character and innate concern for others. She has

shown in her programming at MDC Brooklyn she can motivate herself to make the most of her

situation. Her language skills will certainly aid her in future employment.

A  variance sentence of time-served adequately deters future misconduct and punishes

Ms. Puzyreva for her misconduct in this case.

## F.      MDC Brooklyn Prison Conditions

Ms. Puzyreva has been at MDC Brooklyn for  nearly seven months under horrible

conditions and under personal risk. These facts support a downward variance.

Overly harsh prison conditions is undeniably a legitimate sentencing factor. *United States

v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001). Incarceration during the Pandemic -  constant

lockdowns, medical crises, overcrowding, lack of sanitation – routinely supported reduced

sentences. Perhaps nowhere was this more evident than at MDC Brooklyn. See, e.g., *United

States v. Tellier*, No. 92 Cr. 869 (LGS), 2022 U.S. Dist. LEXIS 84489, 2022 WL 1468381, at *5

(S.D.N.Y. May 10, 2022) (finding "harsh prison conditions" a factor favoring sentence

reduction); *United States v. Rengifo*, 569 F. Supp. 3d 180, 197 (S.D.N.Y. 2021). Even post-

pandemic, courts still consider these conditions in sentencing. *United States v Gomez*, 2023 US

Dist LEXIS 86694, at *8 (EDNY May 17, 2023, No. 18-CR-214 (NGG) (SJB)); *United States v

Nelson*, 2022 US Dist LEXIS 84554, at *15 (EDNY May 10, 2022, No. 10-CR-820 (NGG)).

Unfortunately, harsh conditions at MDC Brooklyn have not abated. It has a severe staff

shortage, greater even than that faced by the BoP nationwide. Two officers were arrested last

year for accepting bribes to smuggle contraband. Lockdowns are the norm. One judge on the

SDNY bench recently granted bail to an elderly defendant expressly to keep him out of MDC

21

custody.[8] He summarized the extensive litany of problems there (reduced staffing, near-perpetual lockdowns, unavailability of medical and psychiatric care, suicide rate, routine drugs and other contraband, squalor in living conditions). Cockroaches, rotting food, and the like abound. Other judges have conducted investigations. This Court recently ordered a hearing in another case to examine gross medical negligence by Bureau of Prisons staff at MDC Brooklyn.[9] On June 7, 2024, an inmate was stabbed to death at MDC Brooklyn. It is routine for judges on the Southern and Eastern district bench to reduce sentences because time spent in custody at MDC Brooklyn is regarded as "penalty plus."

The defense previously made this Court aware of the May 3, 2024 assault on Ms. Puzyreva. Prison officials placed Ms. Puzyreva in Segregation but did not take her to the hospital because "she was not stabbed." Her face was injured. She remained in Segregation for well over a month. Even though the assault was videotaped, and Ms. Puzyreva clearly was not at fault, staff shortages delayed investigation. Ms. Puzyreva also has not received the medical care she needs. She has had severe dental problems her entire stay at MDC Brooklyn which remain unaddressed.

These harsh prison conditions support a downward sentence variance.

G.      **Post-Arrest Rehabilitation**

Ms. Puzyreva has made extremely positive use of her time at MDC Brooklyn - notwithstanding conditions there. She has been teaching French, Russian, Spanish and English to other inmates. She has taken every class and program available to her. She has certificates of completion in Women's Relationships, Start Now, Assert Yourself, Getting to Know Your

---

[8] Order dated 1/4/24, Case 1:22-cr-00303-JMF
[9] *United States v. Marcus Ricketts, et al.*, Case No. 22-CR-106 (LDH).

Healthy Aging Body, To Parent or Not to Parent, Partners in Parenting, and Tutor Training. A30-36. Ms. Puzyreva understands she allowed Goltsev to influence her inappropriately. She has worked hard to develop her own independent identity so this will not happen again.

Ms. Puzyreva has earned the respect and admiration of other inmates, both as a teacher and as a friend.  One inmate, writing as Jane Doe, states Kristina "is ready to help anyone who needs her assistance and always shares [what she has].... she has great positive influence enlightening my [attitude] toward my life and future arrangements.... She is a talented and devoted teacher [who] meticulously teaches other inmates." A18. Ece Alptunger states Kristina "always shows respect and [is] caring [towards] other inmates. Kristina was the first person who took care of me here. She was the one to ask me: Are you hungry? Are you OK?... She [uses her time] to improve her skills day by day." A19. Kimberly Del Rio states "there have been countless times that I have seen her overextend herself and give her last to anyone in need.... Kristina is the type of person that puts herself last and everyone else first, making sacrifices to please other and make sure they are without need." A21. Ms. Libra Palacios believes "Kristina is very kind and patient person who loves to help others.... She motivated me to study and made me more confident. She always encouraged me [when I was insecure] and made me believe in myself...." A22. Sherry Xue Li also notes Kristina "help[s] other inmates when they are emotionally stressed. She comforts them." A24. Kelcey Collins also describes Kristina as the first person to help others who are struggling:  "She has helped me through some personal dark times on more than one occasion.... She is dedicated to educating others and herself." A25. Goddess Chi can see Kristina is looking for her "true self and learning to love that person,.... She's always sharing...especially with those [less] fortunate." A27. Rong Rong Xu shared with Kristina a family with domestic violence and an abusive marriage. "She is a lighthouse of mine.

23

She helped me when [I was going] through [an] emotional breakdown.... She motivated me when I tried to give up on my study." A28.

> She is the only person who has no doubt in my future to become a lawyer.... She puts others' feelings and needs ahead of her own.  She gave out all of her commissaries to the people who have financial difficulty.... She  went to every bunk to provide emotional support every night. She spread her kindness through the entire unit... She melted my frozen heart and made me believe in people again."

Id.

Post-arrest rehabilitation is highly relevant to sentencing and supports here a variance sentence of time served. It speaks to "the history and characteristics of the defendant,…[is] pertinent to 'the need for the sentence imposed' to serve the general purposes of sentencing…in particular, to 'afford adequate deterrence to criminal conduct [and] protect the public from further crimes of the defendant.'" *Pepper v United States*, 562 U.S. at 491. See *United States v Zimmerman*, 2012 US Dist LEXIS 85046, at *18-19 (EDNY June 19, 2012, No. 10-CR-598 (JG)) (post-guilty plea and pre-sentencing conduct highly relevant). The comments made by the inmates with whom Ms. Puzyreva is now incarcerated are entirely consistent with those of her friends, family and neighbors at home. Ms. Puzyreva is a thoroughly decent, unselfish and giving person. Future misconduct is not an issue for her.

**H.**   **Available Sentences and Victim Restitution**

A time-served sentence here is a condign sentence regularly available under the Guidelines, along with sentences of Probation and other conditions. Ms. Puzyreva is eligible for Probation under 18 U.S.C. § 3561(c)(1) and the new Application Note 10(A) to § 5C1.1.  Ms. Puzyreva's plea includes a consent forfeiture order.  Restitution does not apply in her case.

**CONCLUSION**

"Sentencing . . . is in its essence subjective. . . . It is not possible to determine a condign sentence without looking closely at all relevant facts and circumstances and making a nuanced decision." Hon. John L. Kane, *Sentencing: Beyond the Calculus*, Litig., Fall 2010, at 5, cited *in United States v. Bannister, supra,* No. 10-CR-0053, 2011 U.S. Dist. LEXIS 30569, at *185-86. Here, a sentence of time served is amply warranted. Ms. Puzyreva has led a blame-free and hard-working life until now, albeit one badly scarred by domestic violence and mental abuse. Her role in the offense was minimal; she was very clearly manipulated by her husband, and her sentencing should reflect this disparate culpability. Nonetheless, she has fully accepted responsibility and is rebuilding her life conscientiously. She has already completed what would be tantamount to a year's sentence, under harsh conditions. This punishment, and the future consequences of her misconduct, are adequate deterrence. Most importantly, Ms. Puzyreva's fundamental character is surely revealed by the extraordinary support her community shows for her. Everyone who meets her, in her community or in prison, finds someone who always thinks of others first. This is not a person for whom any additional term of custody is justified.

Accordingly, a sentence of time-served is requested.

Dated:  July 10, 2024
      New York, NY

Respectfully submitted,

*Jeff Chabrowe*

Jeffrey Chabrowe
Law Office of Jeffrey Chabrowe
521 Fifth Avenue, 17th Floor
New York, NY 10175
917-529-3921
jeff@chabrowe.com
*Counsel for Kristina Puzyreva*

cc:  Artie McConnell, Esq.
     artie.mcconnell@usdoj.gov
     Ellen H. Sise, Esq.
     ellen.sise@usdoj.gov

25